# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

PATRICIA KARON WORKMAN, et al.,

        Plaintiffs,

v.                          CIVIL ACTION NO.  5:06-cv-00446

KROGER LIMITED PARTNERSHIP I,

        Defendant.

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Motion for Summary Judgment [Docket 22], filed on July 30, 2007.  As per the Court's Scheduling Order [Docket 11] entered on September 27, 2006, responses to dispositive motions were due by August 16, 2007.  Plaintiffs filed their Response to Defendant's Motion for Summary Judgment [Docket 26] on October 2, 2007, nearly six weeks past the Court's deadline.[1]

For the reasons set forth below, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.

---

[1] Plaintiffs indicate in a footnote that the late filing was due to a delay in settlement negotiations and that Defendant does not object to the filing.  Nevertheless, Plaintiffs failed to seek leave of Court as required by the Scheduling Order and the Local Rules, and the Court will accord proper weight to their response, given that it is untimely.

*I. BACKGROUND*

A.      *Facts*

On September 10, 2005, Plaintiff Patricia Karon Workman visited a Kroger store in Fayetteville, West Virginia, and made two separate purchases, approximately forty minutes apart. (Patricia Karon Workman Dep. 34:12-16, Mar. 13, 2007.) Both times, Ms. Workman paid by check. (*Id.*)  Both checks were lawful and drawn on sufficient funds out of Padgett Business Services' account.  (Compl. ¶ 7.)

Ms. Workman is the president and sole shareholder of PKW Enterprises, Inc., an S-corporation doing business as Padgett Business Services (Padgett), which is also a plaintiff in this lawsuit. (Workman Dep. 19:4-23.)  Padgett operates out of an office in Fayetteville.  (*Id.* at 26:23.) Ms. Workman's husband, Dewey Kuhn, the third plaintiff in this lawsuit, volunteers for Padgett. The checks were drawn on Padgett's account because Ms. Workman was purchasing lunch supplies for her business.  (*Id.* 36:14-21.)

On October 7, 2005, Mr. Kuhn went to Kroger and saw a copy of one of Padgett's checks posted at each cash register with a note on it that read, "Do not take these checks until further notice."  (Compl. ¶ 7.)  When Mr. Kuhn asked the cashier why the check was posted, the cashier replied, "It's a bad check; you're writing bad checks."  (Dewey Kuhn Dep. 21:3-6, Mar. 13, 2007.) Three days later, after Mr. Kuhn had told Ms. Workman about the posted checks, they went back to Kroger together to talk to the manager, Dennis Miller.  (Workman Dep. 44:19-21.)  Mr. Miller informed them that David Totten, an employee at Kroger, "had seen that two of these checks had gone through within an hour that day and thought maybe they had been stolen[.]"  (*Id.* at 45:2-10.)

2

According to Ms. Workman, she knows of at least one other person who saw the posted checks: Lynn Pollard, a member of her church.  (*See id.* at 46:3-8.)  After seeing the checks, Ms. Pollard told two other members of the church, Jackie Blankenship and Mike Smith, that Ms. Workman had  been writing bad checks.  (*Id.* at 46:9-13.)  Mr. Miller later admitted to Ms. Workman and Mr. Kuhn that the posting was a "horrendous mistake," and removed the checks.  (*Id.* at 53:8-12.)

B.    *Procedural History*

Plaintiffs filed the instant lawsuit in the Circuit Court of Raleigh County, West Virginia, on May 24, 2006, alleging negligence, slander, and outrageous conduct.  (*See* Docket 1 Ex. A.)  On June 8, 2006, Defendant filed a Notice of Removal [Docket 1], pursuant to 28 U.S.C. §§ 1332(a), 1391, 1441(b), and 1446.[2]  Discovery closed on June 1, 2007, as per the Court's Scheduling Order, and the instant summary judgment motion was filed in accordance with the July 20, 2007 deadline for dispositive motions.

*II.  SUMMARY JUDGMENT STANDARD*

Summary judgment is proper where the pleadings, depositions, and affidavits in the record show that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Summary judgment is inappropriate, however, if there exist factual issues that reasonably

---

[2]  This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) because Defendant is a limited partnership organized under the laws of the State of Ohio and maintains its headquarters and principal place of business in Cincinnati, Ohio, and Plaintiffs are residents of the State of West Virginia.  (Docket 1 ¶¶ 5-6.)  According to the Notice of Removal, the amount in controversy requirement has been met because Plaintiffs offered to compromise their claims against Defendant for $150,000.00 prior to filing suit.  (Docket 1 ¶ 8.)

may be resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). When construing such factual issues, it is well established that the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

The moving party may meet its burden of showing that no genuine issue of fact exists by use of "depositions, answers to interrogatories, answers to requests for admission, and various documents submitted under request for production." *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir. 1984). Once the moving party has met its burden, the burden shifts to the nonmoving party to "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. at 323. Even undisputed facts may give rise to multiple inferences, however, "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

"[A] party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 256. "The mere existence of a scintilla of evidence" in support of the nonmoving party is not enough to withstand summary judgment; the judge must ask whether "the jury could reasonably find for the plaintiff." *Id.* at 252.

## III. ANALYSIS

Federal courts sitting in diversity are to apply the common law of the state in which they sit. *Erie R.R. v. Thompkins*, 304 U.S. 64 (1938). Plaintiffs' complaint alleges three common law torts:

4

negligence, slander, and outrageous conduct.  Accordingly, the common law of West Virginia applies in the instant case.

> A.    *Negligence*

The elements of a negligence claim are well established.  Plaintiffs are required to prove: 1) that Defendant owed them a legal duty; 2) that the duty was breached; 3) that Plaintiffs were injured; and 4) that the injury was proximately caused by Defendant's negligence.  *Rowe v. Sisters of Pallottine Missionary Soc'y*, 211 W. Va. 16, 23, 560 S.E.2d 491, 498 (2001) (requiring a defendant to prove the elements of negligence in order to establish the defense of comparative negligence).  In the case at bar, Plaintiffs fail to establish these elements as a matter of law.

First, Plaintiffs have failed to allege the existence of a legal duty owed them by Defendant. "In order to establish a prima facie case of negligence in West Virginia, it must be shown that the defendant has been guilty of some act or omission in violation of a duty owed to the plaintiff.  No action for negligence will lie without a duty broken."  Syl. pt. 1, *Parsley v. Gen. Motors Acceptance Corp.*, 167 W. Va. 866, 280 S.E.2d 703 (1981).  Although it is true that individuals and corporations alike owe a general duty of care to foreseeable plaintiffs, Plaintiffs in this case have failed to allege a specific legal duty applicable to these facts, and therefore cannot survive summary judgment on their negligence claim.

Even if Plaintiffs had alleged such a duty, and assuming *arguendo* that the duty was breached, Plaintiffs' claim would still fail because they have not offered sufficient proof that they suffered a cognizable injury.  Until relatively recently, under West Virginia negligence law, there could "be no recovery in tort for . . . emotional and mental trouble alone without ascertainable physical injuries arising therefrom[.]"  Syl. pt. 1,  *Monteleone v. Co-Operative Transit Co.*, 128 W.

Va. 340, 36 S.E.2d 475 (1945).  In *Monteleone*, the West Virginia Supreme Court of Appeals refused to adopt a cause of action for what is now known as negligent infliction of emotional distress.  *Cf. id.* at 347, 36 S.E.2d at 478.  That holding was reaffirmed in 1991.  *Johnson v. W. Va. Univ. Hosps., Inc.*, 186 W. Va. 648, 413 S.E.2d 889 (1991) ("As a general rule, absent physical injury, there is no allowable recovery for negligent infliction of emotional distress.").

However, the next year the West Virginia Supreme Court of Appeals carved out an exception to the general rule and allowed a plaintiff to recover for "serious emotional distress, after the plaintiff witnesses a person closely related to the plaintiff suffer critical injury or death as a result of the defendant's negligent conduct, even though such distress did not result in physical injury, if the serious emotional distress was reasonably foreseeable."  Syl. pt. 1, *Heldreth v. Marrs*, 188 W. Va. 481, 425 S.E.2d 157 (1992).  Later that year, the West Virginia court found a much broader exception, allowing recovery "for the negligent infliction of emotional distress absent accompanying physical injury upon a showing of facts sufficient to guarantee that the emotional damages claim is not spurious."  Syl. pt. 2, *Ricottilli v. Summersville Mem'l Hosp.*, 188 W. Va. 674, 425 S.E.2d 629 (1992).

Plaintiffs have established neither a claim for simple negligence nor a claim for negligent infliction of emotional distress.  The record contains no allegation of physical injury to sustain their negligence claim or evidence that Plaintiffs suffered emotional distress in a manner found actionable in *Heldreth*.  Moreover, Plaintiffs have failed to produce sufficient facts to guarantee that any emotional damages claim is not spurious.  Indeed, Plaintiffs have failed to produce to this Court any evidence of special damages whatsoever, and little, if any, evidence of general damages; nothing beyond Plaintiffs' own testimony that they were upset, which is insufficient to support *this* clam.

Without establishing a legal duty owed by Defendant, and without proving damages, Plaintiffs' negligence claim fails as a matter of law.  Therefore, Defendant's motion for summary judgment on Plaintiffs' negligence claim is **GRANTED**.

      B.    *Slander*

Although Plaintiffs allege a count of slander in their complaint, the claim is actually one of libel because the postings by Defendant were in writing.  Because slander and libel are treated together as a claim for defamation under West Virginia law,[3] the Court will examine the claim under the same standard regardless of how it is characterized.  *See* Syl. pt. 8, *Greenfield v. Schmidt Baking Co.*, 199 W. Va. 447, 485 S.E.2d 391 (1997) ("Defamation published in written form, as opposed to spoken form, constitutes libel."); *see also Belcher v. Wal-Mart Stores, Inc.*, 211 W. Va. 712, 568 S.E.2d 19 (2002) (analyzing a slander claim using the test for libel).

In West Virginia, as with most jurisdictions that follow *N.Y. Times v. Sullivan*, 376 U.S. 254 (1964), and its progeny, there are three kinds of plaintiffs in defamation actions: public officials, public figures and private figures.  Syl. pt. 10, *Hinerman v. Daily Gazette Co.*, 188 W. Va. 157, 423 S.E.2d 560 (1992).  A "plaintiff's status sets the standard for assessing the defendant's conduct[;] . . . private figures need only show that the defendants were negligent in publishing the false and defamatory statement."  Syl. pt. 2, *State ex rel. Suriano v. Gaughan*, 198 W. Va. 339, 480 S.E.2d 548 (1996).  The elements to sustain a defamation claim by a private plaintiff are: "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the

---

[3] West Virginia's Constitution protects its citizens against attacks on their reputation by allowing the legislature to "provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation." W. Va. Const. art. III, § 7.

plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury."  Syl. pt. 1, *Crump v. Beckley Newspapers, Inc.*, 173 W. Va. 699, 320 S.E.2d 70 (1984).  The Court addresses each of these elements in turn.

*(1)  Defamatory Statements*

Defamation is "[a] false written or oral statement that damages another's reputation." *Black's Law Dictionary* 448 (8th ed. 2004).  A statement is defamatory if it tends to "reflect shame, contumely, and disgrace" upon the plaintiff.  Syl. pt. 1, *Sprouse v. Clay Commc'n, Inc.*, 158 W. Va. 427, 211 S.E.2d 674 (1975).  Whether a statement is capable of a defamatory meaning is a question of law for the Court.  Syl. pt. 6, *Long v. Egnor*, 176 W. Va. 628, 346 S.E.2d 778 (1986).  Libelous statements, such as the one alleged by Plaintiffs, can be defamatory on their face (*per se*) or by inference combined with extrinsic facts that give rise to a meaning that damages a person's reputation (*per quod*).  *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 112 (5th ed. 1984); *and see generally* William L. Prosser, *Libel Per Quod*, 46 Va. L. Rev. 839 (1960).  In West Virginia, "[d]efamation may be accomplished through inference, implication, innuendo or insinuation, as well as through direct reference."  Syl. pt. 4, *Crump,* 173 W. Va. 699, 320 S.E.2d 70; *see also Greenfield*, 199 W. Va. 447, 485 S.E.2d at 400 (applying *Crump*).

Under the general rule, a statement is defamatory *per se* if its defamatory meaning is readily apparent on its face, or if the statement falls into one of the traditional slander *per se* categories: imputation of 1) a criminal offense; 2) a loathsome disease; 3) a matter affecting the plaintiff's business; or 4) unchastity.  *See* Prosser, *supra* at 844.  The same is true in West Virginia.  *See Mauck v. City of Martinsburg*, 167 W. Va. 332, 336 n.3, 280 S.E.2d 216, 219 n.3 (1981) (analyzing insulting words statute).

8

Specifically applicable to the case at bar, West Virginia has long recognized that statements may be defamatory *per se* if they "impute[] to an officer improper conduct in his office or incompetence to discharge the duties thereof properly, or charge[] a person with incapacity in his trade or profession[.]"  Syl. pt. 4, *Hancock v. Mitchell*, 83 W. Va. 156, 98 S.E. 65 (1919); *Kinney v. Daniels*, 574 F. Supp. 542, 546 n.23 (S.D. W. Va. 1983) (applying *Hancock* to a defamation case brought by a doctor in his professional capacity); *accord Shryock v. S. P. Calkins & Co.*, 248 F. 649, 651 (4th Cir. 1918) (applying Virginia law) ("A written publication, which affects one injuriously in his trade or calling and contains imputations against his honesty and integrity . . . constitutes a prima facie cause of action and is libelous per se[.]").

The written statement at issue here is the posted check with the words "Do not take these checks until further notice" written underneath.  Those words, taken alone, are not harmful to one's reputation, however, the import of the entire message is potentially defamatory.  The Court notes that it is common practice for businesses to post the names of people who write bad checks near cash registers.  This practice reminds cashiers to refuse checks from those people, puts customers on notice of others who may try to pass a bad check, and generally discourages people from attempting to write a bad check, lest their name show up on the list.

Moreover, the check was written on Padgett Business Services' account and signed by Ms. Workman.  (Workman dep. 35:17-22.)  Anyone who saw the posted check and accompanying comment could very well question Padgett's solvency, or Ms. Workman's ability to manage her business.  The problem is compounded because Padgett is an accounting and financial services firm of which Ms. Workman is the president, and because this incident took place in a small town, Fayetteville, where Padgett does business.  (Workman dep. 22:1-4.)  Regarding Mr. Kuhn, who is

a volunteer for Padgett (Kuhn dep. 12:18-20.),  and was, at the time, treasurer of his church (Kuhn dep. 27:22 - 28:2), the posting potentially called into question his fitness to perform his duties in both of those positions.

Because the posting imputed improper conduct to Plaintiffs (i.e., that Plaintiffs were writing bad checks or were insolvent and therefore not qualified to run an accounting business) in their business or trade, the Court finds that Plaintiffs' "slander" claim falls within the category of defamation *per se*.[4]  As such, Plaintiffs have produced sufficient evidence to survive summary judgment as to this element.

*(2)     Nonprivileged Communication to a Third Party*

"Publication," as it pertains to defamation cases, "does not require the printing and mass dissemination of the defamation."  *Crain v. Lightner*, 178 W. Va. 765, 772, 364 S.E.2d 778, 785 (1987) (citations omitted).  Rather, it simply "means any form of intentional or negligent communication of a defamatory statement to a third person, that is, to someone other than the originator and the person defamed."  *Id.* at 772, 364 S.E.2d at 785.  Defendant alleges in its brief that "[t]he only defamatory statements made about the plaintiffs to a third-party were the statements of Lynn Pollard."  (Docket 23 at 6.)  Although it is true that Ms. Pollard made potentially defamatory statements to members of Plaintiffs' church (a practice, by the way, presumably condemned by most

---

[4]  The Court has found two cases with facts essentially identical to this case:  *Norton v. Cooley*, 257 N.E.2d 323, 326 (Ind. App. 1970), and *Shupe v. Rose's Stores, Inc.*, 192 S.E.2d 766 (Va. 1972). Although the court in *Norton* did not follow the same reasoning as the law in West Virginia would dictate, it essentially treated the false posting of a plaintiff's name on a "bad check" list as defamatory *per se*.  *Cf.* 257 N.E.2d at 326.  On the other hand, the court in *Shupe* found that a falsely posted notice not to accept any checks or charges from the plaintiff was not defamatory *per se*.  192 S.E.2d at 767.  *Shupe*, however, is distinguishable on its facts because the plaintiff was acting in her personal capacity and not as the owner and president of a financial services firm as is the case here.

churches), Defendant communicated this information about Plaintiffs to Ms. Pollard by way of the posting. Her actions are further evidence that Defendant's statements were published to persons other than Plaintiffs and Defendant. Further, the posting communicated Defendant's statement to every customer who came through the store during the month or so that the checks were posted.

To defeat this element of a defamation claim, a defendant may raise the defense of privilege. Once a defendant establishes a privilege, the privilege allows the defendant to avoid all liability. *Crump*, 173 W. Va. at 706, 320 S.E.2d at 78. There are two types of privileges: absolute and qualified. *Id.* at 706, 320 S.E.2d at 78. Absolute privileges are limited to certain situations such as governmental proceedings, consent of the plaintiff, broadcasts of statements by political candidates, and similar acts protected by the First Amendment. *Id.* at 706-07, 320 S.E.2d at 78 (citations omitted). Qualified privileges, on the other hand, are "based on a public policy that it is essential that true information be given whenever it is reasonably necessary for the protection of one's own interests, the interests of third persons or certain interests of the public." *Id.* at 707, 320 S.E.2d at 78 (citation omitted).

"A qualified privilege exists when a person publishes a statement in good faith about a subject in which he has an interest or duty and limits the publication of the statement to those persons who have a legitimate interest in the subject matter[.]" Syl. pt. 4, *Dzinglski v. Weirton Steel Corp.*, 191 W. Va. 278, 445 S.E.2d 219 (1994). Qualified privileges have been recognized in a number of other situations that do not implicate the interests of a defendant or third party, including the discharge of a public duty, reports of public proceedings, and "fair comment on matters of public concern." *Crump*, 173 W. Va. at 707, 320 S.E.2d at 79 (citations omitted). Unlike absolute privileges, qualified privileges may be defeated by the showing of actual malice, intent, recklessness,

11

publication "to persons who have no reason to receive the information," or with a purpose "unrelated to the purpose of the privilege." *Id.* at 707, 320 S.E.2d at 78 (citations omitted).

Defendant's allegedly defamatory statement about Plaintiffs was not privileged. It does not fall under any of the categories for absolute privilege nor does it meet the test for a qualified privilege. Regardless of whether Defendant had an interest or duty to publish information regarding Plaintiffs' check, it did not limit its publication. Rather than post the check discretely where only its cashiers could see it or contact Plaintiffs' bank to report the supposedly stolen checks (not to mention the rather obvious option of contacting Plaintiffs themselves), Defendant posted a copy at each of its seven registers for all its customers to see. There is at least an issue of fact as to this element.

### (3)    *Falsity*

The West Virginia Constitution provides for truth as an affirmative defense to a claim for libel. W. Va. Const. art. III § 8. In this case, however, it is undisputed that the statement at issue was false. Defendant, by posting the checks, raised the inference that Plaintiffs were writing bad checks. That simply was not true.   Mr. Miller even admitted to Plaintiffs that the posting was a "horrendous mistake" when they came into the store to resolve the issue. Plaintiffs have met their burden on this issue.

### (4)    *Reference to Plaintiffs*

This element is undisputed. The posted checks clearly contained enough information to identify all of the Plaintiffs, as evinced by Ms. Pollard's recognition of the check as that of the Plaintiffs when she visited Defendant's store.

*(5)      At Least Negligence on the Part of the Publisher[5]*

"In determining whether a particular defendant is liable to a private individual for defamation, in the absence of a privileged communication, the standard is one of negligence, and the conduct of the defendant is to be measured against what a reasonably prudent person would have done under the same or similar circumstances."  Syl. pt. 2, *Crump*, 173 W. Va. 699, 320 S.E.2d 70. Even though the Court grants summary judgment to Defendant on Plaintiffs' negligence claim, the Court draws a distinction between the kind of negligence required in a simple negligence cause of action, and that which is necessary to sustain a defamation claim.  In this case, Defendant did not owe a general duty of care to Plaintiffs relative to these facts; however, it did owe a duty of care to act reasonably in publishing the allegedly defamatory statement.

"The question[] of negligence . . . [is a] question[] of fact for the jury where the evidence is conflicting or when the facts, though undisputed, are such that reasonable men draw different conclusions from them."  Syl. pt. 2, *Evans v. Farmer*, 148 W. Va. 142, 133 S.E.2d 710 (1963). Although the Court is hesitant to make Plaintiffs' argument for them, especially when they have failed to address this issue in their response to Defendant's summary judgment motion, the record as it stands leaves this element open to decision by a jury.[6]  Names or checks posted at a merchant's

---

[5] As noted above, the standard would be different if Plaintiffs were public officials or public figures. Public officials and public figures must prove that the defendant acted with "actual malice," *N.Y. Times*, 376 U.S. 254, meaning in West Virginia that "the person who uttered the defamatory statement either knew the statement was false or *knew* that he was publishing the statement in reckless disregard of whether the statement was false."  Syl. pt. 1, *Hinerman*, 188 W. Va. 157, 423 S.E.2d 560.

[6] Although Plaintiffs have alleged enough that a jury could reasonably conclude that Defendant was negligent, they have not submitted proof of any intentional, reckless, or malicious conduct by Defendant.  Therefore, Plaintiffs are entitled to recover only actual damages, but not punitive (continued...)

cash register are usually there as a result of "bounced" checks or other concrete evidence of financial irresponsibility or dishonesty.  In this case, Kroger employees assumed that two checks passed within an hour on one account meant the checks were stolen and justified their public posting.  A jury must decide if these facts equal the requisite culpability.

(6)     *Resulting Injury*

Plaintiffs have testified that they "feel" like a decline in their business has been caused by Defendant's actions.  (Workman dep. 61:1 - 66:2.)  A mere feeling, absent expert testimony, proof of causally related lost income, or former clients' testimony that they refuse to do business with Padgett because of the posting, is not enough to support a claim for special damages.  In fact, there is no evidence of special damages in this case.  However, the absence of special damages does not defeat Plaintiffs' defamation claim.

Generally, in cases involving a statement that is defamatory *per se*, "existence of damage [is] conclusively presumed or assumed from the publication of the libel itself."  Keeton, *supra*, § 112; *see also* Prosser, *supra*, at 844 ("libel which carrie[s] its defamatory imputation upon its face [is] still actionable without proof of damage").  In cases where a statement's defamatory meaning is gleaned from context (*per quod*), harm to reputation is not presumed and a plaintiff is required to prove special damages.[7]  Keeton, *supra*, § 112.

---

[6](...continued)
damages.  *See* Syl. pt. 1, *Havalunch v. Mazza*, 170 W. Va. 268, 294 S.E.2d 70 (W. Va. 1982).

[7]  The distinction exists because "the libel, as a libel, is incomplete[;] [u]ntil the extrinsic facts are proved, no defamation is made out at all; and these facts are not incorporated into the libel."  Prosser, *supra*, at 849.

The same is true in West Virginia:  "Where the words are actionable per se, it is not necessary to aver or prove special damages, since in all such cases the law implies damages from the nature of the language used."  *Milan v. Long*, 78 W. Va. 102, 104, 88 S.E. 618, 620 (1916).  A statement that is defamatory *per se*, such as one that harms a plaintiff in his or her professional capacity, "is actionable without allegation or proof of special damages."  Syl. pt. 4, *Hancock*, 83 W. Va. 156, 98 S.E.2d 65; *accord Shryock*, 248 F. at 651 (applying Virginia law) ("In an action for libel, if the document is libelous, then damages follow as a matter of course -- damages of some amount.").  At least one court applying West Virginia law has required "[e]ither actionability of the statement irrespective of special harm or the existence of special harm caused by the publication."  *Kinney*, 574 F. Supp. at 546 (citation omitted).

As discussed above, the Court **FINDS** as a matter of law that the statement at issue in this case is in the nature of defamation *per se*.  Thus, the Court is satisfied that Plaintiffs are not required to allege and prove special damages as damages in some amount would be presumed by a finding by a jury of a defamatory statement.[8]

Based on the foregoing analysis, the Court **FINDS** that there are genuine issues of material fact with regard to Plaintiffs' defamation claim and, therefore, Defendant's motion for summary judgment as to this claim is **DENIED**.

C.      *Outrageous Conduct*

In its brief, Defendant moves for judgment as a matter of law on Plaintiffs' outrageous conduct claim.  In their response, Plaintiffs indicate that they do not wish to pursue this claim and,

---

[8]  Put another way, if the jury finds for Plaintiffs on the first five elements, because this is a defamation *per se* case, the jury's next task would be to decide not whether there are damages, but what the amount is.

15

therefore, do not object to its dismissal.  (Docket 26 at 5 n.2.)  Accordingly, Defendant's motion for

summary judgment on Plaintiffs' outrageous conduct claim is **GRANTED**.

## IV.  CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment [Docket 22] is

**GRANTED IN PART** as to Plaintiffs' claims for negligence and outrageous conduct and **DENIED**

**IN PART** as to Plaintiffs' claim for slander.  The Court **DIRECTS** the Clerk to send a copy of this

Memorandum Opinion and Order to counsel of record and any unrepresented party.


ENTER:          October 11, 2007


THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

16